303 Ga. 533
FINAL COPY

S18A0429. WHITE v. THE STATE.

Boggs, Justice.

Appellant Clifford Jacob White was found guilty of murdering his wife,
Linda White.[1] He now appeals, asserting that the evidence was insufficient to
sustain his malice murder conviction, and that he received ineffective assistance
of trial counsel. For the following reasons, we affirm.

Construed in the light most favorable to the verdict, the evidence showed
that White and his wife Linda were the caretakers for a baby girl born to a friend
of White's sister. At some point, White developed a romantic relationship with

[1] The crimes occurred between January 22 and January 25, 2008. On March 11, 2009,
a Worth County grand jury indicted White on charges of murder, felony murder, and
aggravated assault. Following a June 23-25, 2009 trial, the jury found him guilty on all
counts, and he was sentenced to life in prison. The trial court merged the aggravated assault
count into malice murder. And although the court purported to merge the felony murder
count into malice murder, the former was actually vacated by operation of law. See Malcolm
v. State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). White's motion for new trial was
filed on July 8, 2009, amended by new counsel on February 5, 2016, and denied on May 19,
2016. White's motion for out-of-time appeal was filed on March 20, 2017, and granted on
the same day. His notice of appeal was also filed on March 20, 2017. This case was docketed
in this Court for the term beginning in December 2017 and submitted for a decision on the
briefs.

his neighbor, Adrianna Wray. He told Wray that he and Linda were not getting along, and that if she tried to leave him and take the baby, he would kill her. White's sister, April Sanchez, and her husband Marco Sanchez, lived with the Whites for some time, but moved out during the week of January 21 because they were not getting along with Linda. When they moved back into the home a few days later, White told them that Linda had moved out and left him. He also told them not to open the freezer on the porch because something was wrong with it, and that if they saw blood in the house, it was because his dog had killed a cat in the house.

On the afternoon of January 23, White went to Wray's workplace and asked her to cash a $10,000 check made out to Linda. White had Linda's purse containing her identification to assist in cashing the check. White told Wray that Linda had "gotten in a white car with some guy and drove off" and was not coming back. He also asked Wray later that night if he could store some meat in her freezer because his was not working. White told a relative that Linda had left him and that she had gone to Alabama. He asked this relative if he could borrow a backhoe so that he could dig a hole to bury trash in.

On January 25, White's brother-in-law Marco was attempting to repair a

water pipe at White's home, and when he moved the freezer that was outside the home, the door opened and he saw Linda's body inside. He told his wife April, and they went to the home of an aunt who called police. When officers arrived at the home, they asked White if he had a freezer. White first said no, but then admitted that he had a freezer on the back porch, and gave the officer permission to look inside. An officer discovered Linda's body in the freezer. She was partially dressed and had a bag over her head. White told officers that he had not been at the home because he had been arguing with Linda, and that she had called him from Alabama the day before.

Investigators found blood in several locations in the home and a hammer containing blood in a box in the laundry room. They also collected a pair of gloves that contained Linda's blood. The medical examiner testified that Linda had four lacerations to her scalp caused by blunt force trauma, abrasions and bruises all over her body, including defensive wounds, multiple skull fractures, and hemorrhages in her scalp. The cause of her death was blunt force trauma to the head.

White testified at trial and admitted to killing Linda with a hammer. He explained that he and Linda would argue because he did not approve of her

3

drinking while taking care of the baby, and that he observed her "snatch [the baby] up and be rough with her." White stated further that on Monday night, January 21, Linda told him she was "going to leave," and when he attempted to get his belongings, she came out of the bedroom and threw the baby at him. White caught the child, but her head hit him. The next day, he awoke to the baby crying and went into her room when he observed Linda holding the child by her arm and shaking her. White explained that he took the child and laid her back down, and told Linda that he "was fixing to leave." Linda responded that she was going to kill White and the baby. White explained that Linda kicked him in the thigh and turned to go into the kitchen when he "just lost it" and picked up a hammer and hit her with it. White stated that he did not intend to kill Linda, and that he later cleaned up the blood in the home because he was afraid of losing the baby. He admitted that he lied to police about his whereabouts on January 21 and lied to others about Linda's whereabouts, and admitted he was planning to use a backhoe to bury Linda and that he tried to cash Linda's check after her death. White denied telling Wray that he would kill Linda if she ever tried to take the baby from him.

1. White argues that the evidence was insufficient to sustain his conviction

for malice murder. Specifically, he contends that the testimony given at trial did not prove that he acted with an abandoned and malignant heart in striking his wife with the hammer, nor did it show that he had a deliberate intention to take her life.

As the trial court instructed the jury, a person commits malice murder when the evidence shows either an express or implied intent to commit an unlawful homicide. See OCGA § 16-5-1 (a), (b).

> This meaning of malice murder is consistent with the general rule that crimes which are defined so as to require that the defendant intentionally cause a forbidden bad result are usually interpreted to cover one who knows that his conduct is substantially certain to cause the result, whether or not he desires the result to occur. Thus, a specific intent to kill is express malice, whereas an intent to commit acts with such a reckless disregard for human life as to show "an abandoned and malignant heart" amounts to implied malice.

(Citations and punctuation omitted.) Bozzie v. State, 302 Ga. 704, 706 (1) (808 SE2d 671) (2017).

Here, the evidence showed that White struck his wife with the hammer multiple times, and that she had bruises to her arms and legs that were consistent with defensive wounds, and other abrasions on her body. White admitted to hiding her body in a freezer and leading others to believe that she had left him.

5

Although he testified at trial that he did not intend to kill Linda, the jury was free to conclude otherwise. Bozzie, 302 Ga. at 706-707 (1). The evidence presented here was sufficient for a rational trier of fact to find White guilty of malice murder.

2. White argues that he was denied the effective assistance of trial counsel. To prevail on this claim, White must prove both that the performance of his counsel was deficient and that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that counsel's performance was deficient, White must show that he performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). And to prove that he was prejudiced by counsel's performance, White must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694 (III) (B). "Failure to satisfy either prong of the Strickland test is sufficient to defeat a claim of ineffective assistance, and it is not incumbent upon this Court to examine the other prong." (Citation and

punctuation omitted.) Smith v. State, 296 Ga. 731, 733 (2) (770 SE2d 610) (2015).

White complains that counsel failed to interview and call two witnesses, his cousin and her husband, who would have testified about the relationship between him and his wife in the days before the murder in support of his voluntary manslaughter defense.[2] The couple testified at the hearing on the motion for new trial that in the days before Linda's death, they were at White's home. They testified that Linda had been drinking and that she and White were arguing when she threw the baby at him causing the baby's head to hit White's chin. They explained further that they witnessed Linda jerk the baby up by her arm and throw her back down. The couple called the police who told White that he could not take the baby with him and that he should remain in the home to make sure the baby was safe. After Linda's death and White's arrest, the couple gave statements to police of what they observed when they were in White's home.

Trial counsel testified that he did not specifically recall White's cousin

---

[2] The trial court instructed the jury on voluntary manslaughter, and this option was listed on the verdict form.

7

and her husband or what they witnessed, but that he reviewed the State's witness list before trial. White testified that he asked trial counsel to call the couple as witnesses at trial, but counsel told him that they were on the State's witness list and that he would get to cross-examine them. However, the State did not call them at trial.

Even assuming trial counsel performed deficiently in not calling the couple to testify at trial, White cannot show a reasonable probability that the trial result would have been different had they testified. The couple could not recall when they observed the argument between Linda and White and were not present on the day of the murder, White also testified concerning the argument, and there was other evidence of the tumultuous relationship between White and Linda. Under these circumstances, White has failed to show how additional testimony concerning an argument between him and Linda days before the murder "would in reasonable probability have convinced the jury not to convict him of malice murder." Stork v. State, 303 Ga. 21, 23 (2) (810 SE2d 81) (2018).

As White has failed to prove prejudice from counsel's performance, his ineffective assistance claim fails.

Judgment affirmed. All the Justices concur.

8

Decided April 16, 2018.

Murder. Worth Superior Court. Before Judge Cross.

Chauntilia K. Adaway, for appellant.

C. Paul Bowden, District Attorney, Jennifer D. Hart, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Aimee F. Sobhani, Assistant Attorney General, for appellee.